IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 26, 2011

**STATE OF TENNESSEE v. GLYN DALE**

**Direct Appeal from the Criminal Court for Knox County**
**No. 83055     Bob R. McGee, Judge**

**No. E2010-01824-CCA-R3-CD - Filed February 1, 2012**

The appellant, Glyn Dale, appeals the Knox County Criminal Court's ordering him to serve
concurrent twenty-five-year sentences for two convictions of rape of a child. On appeal, the
appellant contends that his sentences are excessive. Based upon the record and the parties'
briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are**
**Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JERRY L. SMITH and
D. KELLY THOMAS, JR., JJ., joined.

Aubrey L. Davis, Knoxville, Tennessee, for the appellant, Glyn Dale.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney
General; Randall E. Nichols, District Attorney General; and Steve Sword, Assistant District
Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The record reflects that in August 2007, a Knox County Criminal Court Jury convicted
the appellant of two counts of rape of a child, a Class A felony. After a sentencing hearing,
the appellant received concurrent twenty-year sentences to be served at one hundred percent.
On direct appeal, a panel of this court gave the following factual account of the crimes:

> At trial, the victim, E.C., testified that she was twelve
> years old when she was raped by the Defendant at her aunt's

house. E.C. stated that she would occasionally stay with her aunt, Michele Brown, during the weekend. The Defendant also spent significant time at Ms. Michele Brown's house because he and Ms. Michele Brown have three children together. The Defendant frequently spent the night when E.C. and her brother were visiting.

E.C. testified that she stayed at Ms. Michele Brown's house for a weekend in June 2004, and on that weekend, E.C. was watching a movie in the living room on the couch after everyone went to sleep. E.C. was partially awake when the Defendant "came in there and got on top of [her] and took his clothes off" and said, "'don't tell nobody and don't yell.'" The Defendant then removed E.C.'s clothes and vaginally penetrated her with his penis. The rape lasted approximately two to three minutes before the Defendant left. The next morning, E.C. used the bathroom and noticed blood coming from her vagina. E.C. stated that the rape "hurted" and that she cried herself to sleep that night.

E.C. then testified that the Defendant raped her again before her thirteenth birthday in July 2004. This time, E.C. was asleep at Ms. Michele Brown's house on a different couch in the living room when she woke up and the Defendant "was on top of [her]" and said, "'[d]on't scream and don't yell.'" The Defendant got off her after two or three minutes. E.C. stated that this rape also "hurted" but that she did not see any blood after this rape.

According to [A.P.],[1] E.C.'s mother, E.C.'s behavior changed after the rapes, and she became "hard to deal with." Before the rapes, she was "a good little girl" who was "to herself, kind of quiet . . . but overall she's a good, happy child." After the rapes, in the Fall of 2004, E.C. was "just kind of mad . . . [and] short with people." [A.P.] repeatedly asked E.C. if "anybody bothered her or touched her," but she "couldn't get anything out of her" until she visited E.C.'s school and spoke

---

[1]In the direct appeal opinion, this court referred to E.C. by her initials in order to protect her identity. To further protect the victim's identity, we will refer to the victim's mother by her initials.

with the principal, David Dowling.

Mr. Dowling testified that E.C. was a quiet girl who was "struggling with work habits, wanting to do well, trying to get her education going in the right direction." However, in the Fall of 2004, E.C. was "[s]hort-tempered [and] withdrawn." He attempted to talk to her on several occasions, and he called her into his office on several occasions. On one such occasion, in September 2004, E.C. told him that she was raped by a family member's boyfriend. Mr. Dowling then called [A.P.], who came to the office and talked with E.C. about the rapes.

E.C. was eventually taken to the ChildHelp Children's Center of East Tennessee (ChildHelp) on Kingston Pike in Knoxville, Tennessee. At ChildHelp, Dr. Charles William Machen performed a "full-systems physical examination" on E.C. Among other areas, he examined her external genitalia, the vulval vestibule, and the hymen. Dr. Machen stated that E.C. had "two notches in her hymen." One notch was very shallow and the other "was a deeper notch that extended to at least 50 [percent] of the width of the hymen." According to Dr. Machen, the second notch was significant because "when you see a notch that extends to at least 50 [percent] of the width of the hymen or greater, that notch is concerning for trauma, blunt or penetrating trauma, to the hymen." He stated that because E.C. had a "fully pubertal hymen," her hymen was "thicker and more elastic;" therefore, if a doctor had applied sutures at the time of the trauma, her hymen may have healed. However, because her hymen was not repaired, "the edges of [the] tear beg[a]n to smooth out," and the notches formed. He stated that these notches were consistent with some form of penetration.

Sometime after E.C. told [A.P.] and Mr. Dowling about the rapes, the Defendant called Ms. Michele Brown's mother, Addie Brown. He spoke with Ms. A. Brown and her son, Mr. Glen William Butts, III, about the rapes. Ms. A. Brown lived next door to Ms. Michele Brown with her son, Mr. Butts. Mr. Butts and Ms. A. Brown both testified at trial regarding their conversation with the Defendant. Although the Defendant had a speech impediment and tended to slur his words, Mr. Butts and

Ms. A. Brown contended that they understood the Defendant and knew what he was saying.

Ms. A. Brown stated that she had known the Defendant for approximately fifteen years because he lived with her daughter in the house next to her house. She knew "something about [E.C.] having sex with somebody," but she never noticed anything between E.C. and the Defendant. However, she did "recall [the Defendant] calling [E.C.] to the [Defendant's] bedroom a couple of times." Ms. A. Brown first heard about the rapes when the Defendant called her house and said that "he was the one that we were looking for that had sex with [E.C.]" According to Ms. A. Brown, the Defendant sounded "arrogant." He stated that he was "interrupted the first time" he had sex with E.C. When she asked him, "how many times did this go on," the Defendant answered, "Oh, two times." He said that he had sex with her "right before her 13th birthday." When Ms. A. Brown told the Defendant that "he was going to jail," he responded by saying, "that's what [my] daddy told [me]."

Mr. Butts stated that he had known the Defendant for approximately ten years and that he worked with the Defendant at the Tennessee Valley Authority in Kingston, Tennessee. He first heard about the rapes when the Defendant called his house. When Mr. Butts heard Ms. A. Brown on the phone, he grabbed the phone from her to speak with the Defendant. According to Mr. Butts, the Defendant said, "I f--d up, I f--d up." Later the Defendant said, "I had sex with [E.C.]."

After a Tennessee Rules of Evidence 412 hearing, Ms. Michele Brown testified as a defense witness at trial. She stated that sometime before E.C. accused the Defendant of raping her, E.C. called her house hoping to speak with her daughter. Ms. Michele Brown spoke with E.C. for a few moments before telling her that it was too late to speak with her daughter, who was approximately seven years old at the time. In their conversation, Ms. Michele Brown asked E.C. if she was having sex with anyone. E.C. stated that she was having sex with a "guy from school." A few days later, Ms. Michele Brown called [A.P.] and told her that "she should get [E.C.] checked because

-4-

[she] believed [E.C. was] having sex."

The Defendant was the last witness to testify at trial. He stated that he has cerebral palsy, which affects "the whole left side of [his] body [and his] speech." He denied ever touching E.C. in an inappropriate manner. He said that the only reason he called Ms. A. Brown and Mr. Butts was to find out "what was going on" because Ms. Michele Brown and his father had just told him that he was accused of raping E.C. He stated that they misunderstood and mischaracterized what he said to them on the telephone.

State v. Glyn Dale, No. E2008-01139-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 271, at **2-8 (Knoxville, Mar. 31 2010) (footnotes omitted), perm. to appeal denied, (Tenn. 2010). This court affirmed the appellant's convictions but reversed his twenty-year sentences and remanded the case to the trial court for a new sentencing hearing because the appellant failed to execute a written waiver of his ex post facto protections. Id. at *2. During a new sentencing hearing, the trial court sentenced the appellant to twenty-five years for each conviction and ordered that the sentences be served concurrently at one hundred percent.

## II. Analysis

The appellant contends that his sentences are excessive. The State argues that the trial court properly sentenced the appellant. We agree with the State.

A review of the appellant's first sentencing hearing is in order. At the hearing, A.P. testified that after the abuse, she and the victim received counseling. As a result of the rapes, the victim developed a learning disorder. A.P. said that the victim often cried at night but that the victim was "doing a little better" now that the appellant had been convicted. She said that the abuse made the victim feel "wrong and ugly" and that the appellant took advantage of the victim.

The State introduced the appellant's presentence report into evidence. According to the report, the then thirty-four-year-old appellant was a high school graduate, had never been married, and had three children with Michele Brown. The appellant described his health as "fair," suffering from cerebral palsy since childhood and having a mild case of paralysis on his left side. In the report, the appellant said that he used alcohol occasionally, that he received social security disability payments for his cerebral palsy, and that he supplemented his disability payments by working with sheet metal. The appellant stated in the report that he did not rape the victim. The report shows no prior criminal history for the appellant.

The State argued that enhancement factor (7), that the "offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement," was applicable because the appellant "was . . . looking for excitement where he could go into where a young defenseless girl was sleeping and get on top of her and take advantage of her." Tenn. Code Ann. § 40-35-114(7) (2010). The State argued that factor (14), that the defendant abused a position of private trust, also applied because the appellant "was in all practical purposes functioning as this girl's uncle." See Tenn. Code Ann. § 40-35-114(14). The trial court applied enhancement factor (14) to the appellant's sentences but noted that the appellant had no prior criminal record. The trial court sentenced him to concurrent twenty-year sentences.

At the appellant's re-sentencing hearing,[2] A.P. addressed the court and gave a victim impact statement. She said that the appellant "did prey upon [the victim] for years and years and nobody knew it" and that the appellant "took advantage of my trust, my baby's trust and the family's trust." She stated that the appellant groomed the victim for three years and that the abuse started when the appellant began putting his hand on the victim's leg and rubbing it. After the rapes, the victim did not have any self-esteem, received counseling, and did poorly in school. The victim, nineteen years old at the time of the re-sentencing hearing and a student at Pellissippi State, still was having trouble in school. A.P said that victim "has suffered tremendously" and that the victim continued to suffer.

The appellant addressed the trial court and asked that the court "show [him] favor" because his parents needed his help. He said that he had three children, who also needed his help, and that he did not prey on the victim. He stated that his being in prison "doesn't solve anything" and asked that the court give him a chance to be a good citizen.

The State reintroduced the appellant's presentence report into evidence and again argued that enhancement factors (7) and (14) were applicable to the appellant's sentences. The State requested that the trial court sentence the appellant to twenty years for each conviction but argued that the sentences should be served consecutively. In mitigation, the appellant claimed that factor (1), that the "defendant's criminal conduct neither caused nor threatened serious bodily injury," was applicable and that factor (13), the "catchall" provision, was applicable for the appellant's lack of a criminal record and employment history. Tenn. Code Ann. § 40-35-113(1), (13).

The trial court noted that this was "an extremely egregious crime. This--this man apparently had been accepted in a role of a family member, a trusted family member" and applied enhancement factor (14) to the appellant's sentences. Regarding factor (7), the court

---

[2]The trial judge at the re-sentencing hearing did not preside over the appellant's trial or first sentencing hearing.

apparently did not apply that factor, stating, "Technically, sexual desire is not an element of rape. On the other hand it's -- it would stretch credulity to try to separate them very much." The trial court refused to apply mitigating factor (1), finding "evidence that there was serious injury." As to consecutive sentencing, the trial court stated that it "would have no problem" ordering consecutive sentencing. However, the trial court instead decided to sentence the appellant to the maximum sentence in the range, twenty-five years, for each conviction and order that the sentences be served concurrently. See Tenn. Code Ann. 40-35-112(a)(1).

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-103(5), -210(b); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The appellant contends that his sentences are excessive because the trial court misapplied enhancement factors (7) and (14). In addition, he argues that the lack of serious bodily injury to the victim, the fact that the two offenses occurred within a short amount of time, and the absence of a prior criminal record justify mitigating his sentences. See Tenn. Code Ann. § 40-35-113(13). The State argues that enhancement factors (7) and (14) are applicable and justify the appellant's twenty-five-year sentences.

Regarding factor (7), that the offenses were committed to gratify the appellant's desire for pleasure or excitement, the trial court's comments suggest that it did not apply that factor. However, we agree with the State that the factor is applicable in this case. Our supreme court has stated that "evidence of ejaculation, by itself, does not prove that the [appellant's] motive was to gratify a desire for pleasure. Accordingly, proper application of factor (7) requires the State to provide additional objective evidence of the [appellant's] motivation to seek pleasure or excitement through sexual assault." State v. Arnett, 49 S.W.3d 250, 262 (Tenn. 2001) (citing State v. Kissinger, 922 S.W.2d 482, 490 (Tenn. 1996)). To this end, the court explained that "factor (7) may be applied with evidence including, but not limited to,

sexually explicit remarks and overt sexual displays made by the defendant, such as fondling or kissing a victim or otherwise behaving in a sexual manner, or remarks or behavior demonstrating the [appellant's] enjoyment" of the crime. Id.

The victim did not testify about any facts that would support application of enhancement factor (7). However, Tennessee Code Annotated section 40-35-207(a)(8) provides that the presentence report "shall set forth . . . [a]ny statement relating to sentencing submitted by the victim of the offense or the investigative agency." Our review of the appellant's presentence report reveals that the Department of Children's Services (DCS) submitted a statement for the report. According to the statement, the victim told an interviewer at ChildHelp in November 2004 that the appellant touched her breasts and kissed her lips during the rapes. See State v. Flynn, 675 S.W.2d 494, 498 (Tenn. Crim. App. 1984) (noting that the traditional rules of evidence are relaxed in a sentencing hearing and stating that "the fact that the statement [in presentence report] was hearsay does not render it inadmissible for sentencing purposes"). The appellant made no objections to the introduction of the presentence report. Therefore, evidence exists in the record to support application of enhancement factor (7).

As to enhancement factor (14), that the appellant abused a position of private trust, we agree with the State that the factor is applicable. As our supreme court has explained,

> The position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples. The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith.

State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996).

In this case, the appellant testified at trial that he had known the victim since she was two years old. A.P. testified at trial that she knew the victim sometimes spent the night at Michele Brown's home and that to her knowledge, the appellant always had lived with Brown. A.P. testified at the sentencing hearing that the appellant took advantage of her trust and the victim's trust. The victim gave no testimony regarding her relationship with the appellant. However, according to the DCS statement in the presentence report, the victim told the ChildHelp interviewer that the appellant was her uncle. Therefore, we believe ample evidence exists in the record to support the trial court's application of factor (14). See State v. Dale Ariss Robinson, No. E2005-01089-CCA-R3-CD2006 Tenn. Crim. App. LEXIS 600,

at *18 (Knoxville, July 25, 2006) (concluding that the defendant occupied a position of private trust when the victim's mother said she trusted the defendant and allowed her children to be around him and when the victim said the defendant was like an uncle to him).

Regarding the appellant's claim that his sentences should be mitigated because the offenses did not cause serious bodily injury to the victim, Dr. Machen testified that he saw blunt or penetrating trauma to the victim's hymen. Moreover, the victim testified that the rapes hurt and that she bled after the first rape. Therefore, we refuse to apply mitigating factor (1). However, the appellant is entitled to some consideration for his lack of a prior criminal record.

In summary, we conclude that the trial court properly applied enhancement factor (14) and that the trial court should have applied enhancement factor (7). Although the appellant was entitled to some mitigation for his lack of a prior criminal record, the trial court properly refused to apply mitigating factor (1). As we have repeatedly stated, the weighing of mitigating and enhancing factors is left to the trial court's sound discretion. State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008). Therefore, we conclude that the trial court properly sentenced the appellant to twenty-five years for the convictions.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-9-